**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHARLES BRACKEN,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:19cv185 |
| | ) | **Electronic Filing** |
| **MANOR TOWNSHIP** and | ) | |
| **ERIC S. PETROSKY** (in his official | ) | |
| capacity and as an individual), jointly and | ) | |
| severally, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

Charles Bracken ("plaintiff") commenced this civil rights action pursuant to 42 U.S.C. § 1983 seeking redress for the alleged violation of his constitutional and state law rights in conjunction with his arrest for carrying a firearm into an elementary school and the criminal charges that followed. Presently before the court are cross motions for summary judgment. For the reasons set forth below, defendants' motion will be granted and plaintiff's motion will be denied.

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(A). Rule 56 "'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Marten v.

1

Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  Deciding a summary judgment motion requires the court to view the facts, draw all reasonable inferences and resolve all doubts in favor of the nonmoving party.  Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim.  Nat'l State Bank v. Fed. Reserve Bank of New York, 979 F.2d 1579, 1581-82 (3d Cir. 1992).  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial*," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(E)) (emphasis in Matsushita).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.  The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" . . . "and cannot simply reassert factually unsupported allegations." Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).  Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs." Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992); Sec. & Exch. Comm'n v. Bonastia, 614 F.2d

908, 914 (3d Cir. 1980) ("[L]egal conclusions, unsupported by documentation of specific facts, are insufficient to create issues of material fact that would preclude summary judgment."). Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion. Robertson v. Allied Signal, Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990). If the non-moving party's evidence is merely colorable or lacks sufficient probative force summary judgment may be granted. Anderson, 477 U.S. at 249-50; see also Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993) (although the court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

The record as read in the light most favorable to plaintiff establishes the background set forth below. Plaintiff's remaining claims of false arrest in violation of the Fourth Amendment against Eric Petrosky ("Petrosky") and Manor Township (collectively "defendants") at Count I, violation of due process under the Fourteenth Amendment against defendants at Count II and malicious prosecution in violation of Pennsylvania law against Petrosky at Count III arise from an incident that occurred on February 21, 2017. On that date plaintiff was an elected Pennsylvania state constable for Kittanning Township, having been most recently elected to that position in 2014, and he continued to hold that office throughout the events discussed below. (Deposition of Charles Bracken, at 11:10-13). Plaintiff obtained certification under Pennsylvania regulations to carry a firearm while performing the duties of constable. His position exempts him from the criminal prohibition against carrying a concealed weapon without a license. See 18 Pa. C. S. §§ 6106(a)(1), (b)(1).

Prior to the events in question plaintiff had married Laurie Braken in 2000 and they had three children.  They were C. B., Jr., C. B., and L. B. (plaintiff's daughter), who in February of 2017 were approximately 18, 16 and 10 years of age respectively.  Near the end of 2016, plaintiff bought a house in Ford City, Pennsylvania.  Prior to that purchase plaintiff and Laurie became estranged and were no longer living together.  They began the process of dissolving the marriage and becoming divorced.  Laurie remained in the Ford City home and plaintiff rented an apartment.

Plaintiff began a relationship with Edith Bowser in January of 2017.  Around that time plaintiff made clear to Laurie that he intended to divorce her.

On or around January 9, 2017, plaintiff received text messages from Laurie wherein she threatened to blow up the house with the children in it.  Thereafter, plaintiff reported the threat to an Armstrong County detective, Robin Davis, in order to discharge his mandatory reporting requirement regarding threats of abuse against children.  Davis was a lead detective with responsibility over the issuance of warrants in the Armstrong County District Attorney's Office and plaintiff had frequent interaction with Davis as part of his work routine as a constable.

On January 31, 2017, Laurie obtained a temporary protection from abuse order ("PFA") against plaintiff.  The order was extended on February 8, 2017, subject to a hearing scheduled for February 23, 2017.  The order did not contain a gun restriction so plaintiff was able to continue to carry a weapon when preforming his constable duties.  It likewise did not have any custody provisions or restrictions.

On or around February 16, 2021, Laurie had a parent/teacher conference with L.B.'s teacher(s) and informed them of the ongoing marital and family issues between her and

plaintiff and that the two were getting a divorce.  She further stated that L.B. was afraid to come to school because plaintiff had been threatening that "[he] can come to school at any time and take [L.B.], and [L.B.] would never see [her] mother."  The teacher shared this quote with Ms. Wasson, the school guidance counselor.  Wasson emailed this information to the principals, the nurse, the secretaries and any staff member who would be responsible for dismissing students as well as to all of L.B.'s teachers.

School officials did not have a custody order on file and recognized that there was not a basis to stop plaintiff from picking up his daughter from school.  They did agree, however, that if plaintiff should come in to pick L.B. up in an unscheduled or unexpected manner, then Laurie would be contacted.  In a follow-up conversation, Wasson noted that L.B. had asked to talk about her situation.  In that follow-up conversation L.B. talked about how much she missed her dad, how her mom didn't want her to see him because he would take her away for good, and how she didn't believe that her father would do so.  She also explained that she wasn't afraid of him.  She was just upset about the ongoing custody battle.

On February 21, 2017, plaintiff dressed in one of the three different uniforms he wore when working as a constable.  When he left his residence around 9:30 a.m. he had on a short-sleeved black polo shirt and tan police-style khakis pants known as 5.11.s (police cargo pants), a light-duty police belt and tactical Bates boots.  Plaintiff had his certified service side arm holstered and attached to his service belt.  His radio and hand cuffs also were affixed to the belt.  The microphone to the radio was clipped to his shirt in front of his chest.  Plaintiff placed his constable vest in the seat of his car.  The vest has a badge-style insignia of "constable" on it.

Plaintiff intended to travel to Leechburg in Armstrong County that morning to meet up with Mike Diebold, and go to Magisterial District Judge Andring's office to check for warrants and serve them.  Plaintiff and Diebold met there fairly regularly on Tuesdays and Thursdays to perform such duties.  Diebold was also Chief of Police in Leechburg at the time, and he would often coordinate with plaintiff the night before about meeting the following morning.[1]

In the evening of February 20, 2017, Laurie had sent text messages to plaintiff directing him to come to her house in Ford City immediately and alone and to bring her cigarettes and a bottle of wine.  The messages contained references to her ongoing insinuations that if he didn't do as she demanded she would kill herself and the children.  She indicated she would end their lives quickly if plaintiff notified the cops and wrote that "gas line explosions happen" all the time in houses.

Plaintiff did not receive the text messages until after he left the house on the morning of February 21, 2017, when he turned on his cellular telephone.  He interpreted the messages as conveying a clear threat that Laurie would harm herself and the two children, C.B. and L.B., if plaintiff called the police.  He immediately became concerned for his children's safety and decided to pick his children up from school and take them to a secure location.

After reading the text messages and becoming alarmed, plaintiff made the decision to go and immediately retrieve his children from school.  He stopped his car and made three telephone calls.  First, he contacted Robin Davis to advise her of the situation.  Plaintiff made his plans of

---

[1] Diebold testified that he was unaware of having any such plans or arrangements with plaintiff on February 21, 2017.

signing his children out from school midday known to Davis and she confirmed that the PFA did not have any child restrictions and he was not prohibited from picking them up.

Plaintiff then telephoned Mike Bramlet, who was head of security for Armstrong Area Schools, and apprised him of his intentions to "first go to the high school and pick up his son . . . and then go to Lenape Elementary School to pick up his daughter . . ."[2]  Plaintiff recently had been working armed security details for Bramlet at a couple of locations and talked to him all the time.  Plaintiff believed Bramlet needed to be aware of the most recent threat from Laurie and plaintiff's decision to get his children from school in order to protect their safety.  Bramlet did not tell plaintiff to stop or suggest that plaintiff should not follow through with his intention to get his children.

Plaintiff then called defendant Chief Petrosky.  He first called his cellular telephone, but Petrosky didn't answer.  Plaintiff then radioed Petrosky's patrol car, but he still didn't answer.  Plaintiff next radioed Armstrong 911, and asked to be contacted by Petrosky.  Petrosky called back from his office on a restricted line.  Plaintiff made Petrosky aware of the threats from Laurie and plaintiff's intent to proceed to the schools and pick up his children.  Petrosky told plaintiff to "hold on a minute – let me go get the PFA."  After reading it, Petrosky confirmed that the PFA did not have any firearm or custody restrictions.[3]

Plaintiff thought it was necessary to make Petrosky aware of Laurie's threats of harm to the children and plaintiff's intent to go to the schools and get his children.  Plaintiff believed

---

[2]  Bramlet disavowed having received any such telephone call from plaintiff.
[3]  Petrosky disavowed having any such telephone communications with plaintiff.

this was necessary because he "knew the mother would cause problems at the time."  Plaintiff told Petrosky that he was working that day.  He did not tell him he was carrying his side arm.  Plaintiff assumed Petrosky would infer from the revelation that plaintiff was working that Petrosky would recognize that plaintiff was carrying his service weapon.

Plaintiff proceeded to the high school to get his son.  He parked in the short-term space in front of the school and proceeded into the school.  He "hit the buzzer" and walked to the security area and announced that he was there to pick up his son.  There were two security guards present and plaintiff knew them both.  A secretary retrieved plaintiff's son from class and then they left the school.  Plaintiff met Edith Bowser at a nearby location and she took the son into her car.  It was plaintiff's intent to meet back up with the two of them once plaintiff retrieved his daughter, and then all of them would proceed to CYS to report the threat from Laurie.

Plaintiff proceeded to Lenape Elementary School to pick up his daughter.  Plaintiff parked right in front of the school in the bus lane.  He just planned on being there long enough to explain things to the guidance counselor and get his daughter.  He still had his work clothes and service belt on.  His service radio was hooked to his belt with the microphone clipped on his shirt, his hand cuffs were on the backside of the belt and his service pistol was secured in a holster on his right side.  He did not have on his vest with the constable insignia, nor did he have anything else on displaying an official emblem.

Plaintiff proceeded to the buzzer and was met by Denise Lasher, a secretary.  Plaintiff explained that he wanted to pick up his daughter and he signed to take her out of school.  He

then asked to see the guidance counselor.  Within a few minutes Guidance Counselor Ashley Wasson appeared.

Plaintiff announced that he was Charles Bracken and he was there to pick up his daughter.  Wasson responded in a somewhat startled manner and commented that she though plaintiff was school security.  Plaintiff said, no I'm a state constable and I'm here to pick up my daughter.  Plaintiff did not see Wasson staring at his gun, but he did pull out his state constable identification and driver's license and presented them to Wasson.  The two of them then stepped into Wasson's office, which was close by.

Plaintiff proceeded to tell Wasson about the communications from Laurie that contained threats to the safety of the children.  She asked to see them.  There were five or six text messages on plaintiff's cell phone and the two of them went through them.[4]  Wasson took notes as they progressed.  Wasson then asked about what was going on, and plaintiff told her about the active PFA.  Their conversation went on for about 15 minutes.  Wasson then said she had to contact the principal.

Wasson left the room, telephoned the principal and then returned.  She asked if plaintiff could wait until the principal arrived and plaintiff agreed to do so.  Wasson and plaintiff continued to discuss the threats to the children and the concern for their safety.

The principal, Paula Kiljowski, telephoned head school security officer Mike Bramlet.  Kiljowski told Bramlet that plaintiff was on school property, he had his side arm, there was an

---

[4]  Plaintiff was only able to produce one of these text messages in discovery.  According to plaintiff, he no longer had the same cellular telephone and the other messages, including the one sent on the night of February 16, 2017, were permanently lost with his change in cell phones.

active PFA against him and staff members were "terrified" and did not know how to respond to the situation.  Bramlet proceeded to the school and called Petrosky and asked that he too respond to the school.  Bramlet advised Petrosky that plaintiff was at the school with a gun.

Within a few minutes of Wasson leaving the conference room where plaintiff was located, Bramlet came to the door.  He asked to speak to Wasson and the two of them stepped just outside the door and began talking.  Wasson explained that plaintiff was there asking to pick up his child and there was an active PFA against him.  She also explained that the school had been contacted by Laurie and asked that she be contacted if plaintiff came to put up his daughter, and she had been contacted and was on her way there.  So the school officials did not know what to do.[5]

Plaintiff could overhear Wasson informing Bramlet about the threatening text messages on plaintiff's telephone and the two of them discussing the same.  Bramlet did not speak to plaintiff at this time.

Bramlet came into the room where plaintiff was sitting a few minutes later and announced that "Eric is here."  Plaintiff knew Bramlet was referring to Petrosky because plaintiff had a partial view of the front the school and saw his cruiser pull up.  He also had his police radio on and heard the dispatch going back and forth when Petrosky announced on the air that he had arrived at the school.

---

[5]  Bramlet believed that the reason the school secretaries and Wasson were "terrified" by the situation was because Laurie had been to the school a number of times and made statements implying that if plaintiff showed up to get his child he would engage in violent or threatening behavior.  Plaintiff had worked with Bramlet and Bramlet had never known plaintiff to engage in such behavior and believed that plaintiff would not do so.  It was also his observation that once he and Petrosky arrived at the school, everyone calmed down immediately.

Petrosky appeared in the doorway, pointed his finger at plaintiff and said "I'm taking you in." Plaintiff responded with surprise and inquired "for what." Petrosky said for the "PFA violation and felony gun charges." Plaintiff questioned as to what PFA and gun violation and Petrosky then stated that Laurie was in the building. Plaintiff said: "unbeknownst to me."

Plaintiff then told Petrosky that because he was at the school first and he did not know that Laurie had come to the school thereafter, there had not been a PFA violation and, of the two of them, she was the one required to leave the premises.

Petrosky also asked plaintiff if he was at the school on official business and plaintiff replied that he was there to pick up his child. Plaintiff added that he had intended to engage in official work before he came to the school and afterwards. Petrosky told plaintiff that having a weapon on school property was a felony offense. Plaintiff asked Petrosky about whether there was a felony gun violation, but decided not to question Petrosky further about that issue while at the school.

Petrosky then directed Diebold to stand at the door and Petrosky walked down the hall. Plaintiff later learned that Petrosky had left to talk to Laurie. Petrosky returned and asked for plaintiff's weapon, and after announcing what he was going to do, plaintiff slowly took it out of the holster and placed it on the bookshelf. He then stepped away from it as far as he could so Petrosky could take possession of it, which he did.

In addition to talking to plaintiff, Petrosky spoke with Bramlet, Wasson, Laurie and Lasher. Bramlet confirmed that plaintiff was not working school security that day. From Petrosky's perspective, plaintiff confirmed that he was not at the school to conduct official business. Wasson conveyed that the situation was very stressful and disturbing because

plaintiff was not part of school security and had come to pick up his child at school with a gun. In addition, school personnel were aware of the PFA and had contacted the mother, who also was at the school.

Petrosky asked Bramlet for a copy of the school surveillance camera footage and Bramlet left for a brief period of time and returned with a Digital Video Compact Disk, which plaintiff assumed had the footage of him entering the school. After receiving the DVD, Petrosky then grabbed plaintiff by the right arm and escorted him out of the school, placed him in the patrol car and took him to the station.

At the station Petrosky placed plaintiff in a chair next to Petrosky's desk. Petrosky then placed plaintiff's service pistol in the gun safe, returned to his desk and made a call to the District Attorney's office. Petrosky was unable to speak to someone immediately and had to wait for a return telephone call.

Plaintiff was seated right next to Petrosky's desk when Petrosky took the return call from the District Attorney's office. Plaintiff could hear both sides of the conversation clearly, and plaintiff immediately knew it was assistant district attorney Chase McClister on the line because he knew ADA McClister and recognized his voice. Petrosky explained that he had taken plaintiff in on a PFA violation and felony weapon charges. In discussing the matter, ADA McClister asked Petrosky whether plaintiff and Laurie had made contact at the school (i.e., been in the same place together). Petrosky said no. McClister asked whether plaintiff or Laurie arrived at the school first. When Petrosky indicated it was plaintiff, McClister told Petrosky to "release him" because there had not been a PFA violation. When Petrosky raised

the "felony gun" charges, McClister simply responded that there had not been a felony gun violation.[6]  Petrosky seemed frustrated and slammed the telephone down as he hung up.

At that juncture, plaintiff could hear Laurie and her mother coming into the station. Petrosky told plaintiff to stay put, went to meet them and then returned.  He then took plaintiff back to the holding cell and, using the affixed shackle, strapped his right arm to the bench. Plaintiff remained strapped to the bench while Petrosky talked to Laurie and her mother for a few minutes.  Plaintiff overheard Petrosky tell them that plaintiff was being charged with a PFA violation and felony gun charges.  The two of them wanted to know where plaintiff's son was, and Petrosky returned and asked plaintiff.  Plaintiff declined to provide any information in response.  After Laurie and her mother left the station, Petrosky returned and released plaintiff. Plaintiff had been strapped in the holding cell for somewhere between five and ten minutes.

Petrosky escorted plaintiff back to his office.  He then indicated he would take plaintiff back to his car.  He did not return plaintiff's certified firearm at that time.  On the ride back to the school, plaintiff asked what he really was being charged with and Petrosky said "DC" (disorderly conduct) and he would receive the citation in the mail.  Plaintiff asked because he believed Petrosky could not really charge him with either a PFA violation or a felony gun offense.  Petrosky stopped to talk to Bramlet when they got to the school, and, upon inquiry, Petrosky advised Bramlet that plaintiff was being charged with disorderly conduct.  Plaintiff

---

[6]  McClister denied making such a statement.  According to McClister, he advised Petrosky that further research was needed to ascertain a better understanding of the law governing such conduct by a constable and in turn make a decision about plaintiff's conduct.

was released from the back of the cruiser and he and Bramlet talked for a bit while Petrosky drove off.

Plaintiff went home and made a few telephone calls.  One of them was to Diebold to advise that plaintiff would not be working with him for the rest of the week.  Another was to Magisterial District Judge Andring to advise about what had happened and that he initially had been told he was getting charged with a PFA violation and a felony gun charge, but then was advised it would only be a disorderly conduct charge.

A few days after the incident plaintiff requested the services of his divorce lawyer, Attorney Ziembicki,[7] to assist him in getting his service weapon returned.  Attorney Ziembecki met with plaintiff and after receiving his account of what happened, did some initial research about plaintiff possession of a weapon on school property.  Within a few days she came across the Superior Count of Pennsylvania's panel decision in Commonwealth v. Goslin, 156 A.3d 314 (Pa. Sup. 2017).  She believed that the case was on point and precluded the filing of charges against plaintiff.  She reached out to Petrosky at first, but he kept saying that charges were going to be filed and did not seem to appreciate what she believed was the preclusive effect of the case.  She then made contact with the Armstrong District Attorney's Office in order to make headway in her representation of plaintiff.

Over the course of the summer Attorney Ziembicki had conversations with individuals at the District Attorney's office in an effort to get Petrosky to understand the import of the Goslin case and in turn obtain release of plaintiff's service weapon.  She had a number of

---

[7] Attorney Ziembicki voluntarily relinquished her license to practice law in 2019.

conversations with then District Attorney Scott Andressi, who was in the midst of running an election campaign for a seat on the County Court of Common Pleas, as well as conversations with First Assistant Katie Charlton.  Attorney Ziembicki persistently emphasized that Goslin precluded the filing of charges against plaintiff and made clear that plaintiff's service weapon should be returned to him.[8]  Petrosky did not return the handgun to plaintiff.

On November 22, 2017, Petrosky filed a criminal complaint against plaintiff charging him with misdemeanor offenses for possessing a weapon on school property in violation of 18 Pa. C. S. § 912(b) and disorderly conduct in violation of 18 Pa. C. S. § 5503(4).  Because the charges were misdemeanor offenses, Petrosky was not required to obtain pre-filing approval from the District Attorney's Office.

Plaintiff did not receive a copy of the complaint in the mail.  Instead, he became aware of it after he received a letter from an attorney referencing the complaint and offering legal services.  Plaintiff was notified on December 28, 2017, that his firearms certification was revoked as a result of the charges.  A preliminary hearing was scheduled for January 9, 2018, but was continued to January 30, 2018.

Plaintiff continued to be represented by Attorney Ziembicki and she engaged in further discussions with Petrosky about the charges.  She also had further discussions with Katie Charlton, who had become the District Attorney in January of 2018.  At one point Ziembicki was engaged in a discussion with Petrosky and plaintiff about the pending charges and

---

[8] After the Goslin case was uncovered, plaintiff forwarded a copy of the case to Magisterial District Judge Andring.  In a subsequent in-person conversation, Judge Andring told plaintiff that the case was on point with regard to his predicament with Petrosky.

Petrosky became loud with Ziembicki and appeared to be very angry with plaintiff.  This was not out of character for Petrosky because he frequently had a hostile demeanor with defense attorneys.

On January 30, 2018, the charges were withdrawn.  Petrosky agreed to withdraw the charges on the recommendation of District Attorney Charlton.

Plaintiff had to send his credentials back after the charges were filed and he did not receive new credentials that excluded the use of a firearm – which he was supposed to receive.  It took approximately one month after the charges were withdrawn for plaintiff to get his credentials straightened around.  During this time plaintiff was not suspended from working as a constable, but he was without the proper identification that he used in performing constable duties.  Plaintiff then was able to complete the process for the return of his service weapon.

Under the direction of District Attorney Andreassi, the District Attorney's Office did not have a formal protocol for selecting constables to serve warrants for the office.  Over the years, plaintiff served a lot of warrants for the office and he had developed a good working relationship with the office via Detective Davis and DA Andreassi.  Plaintiff was very appreciated and respected.  Nevertheless, when the PFA was issued against plaintiff, Davis and Andreassi had a discussion about it and decided that the District Attorney's Office would stop using plaintiff to serve warrants.  Plaintiff thereafter would stop in from time to time, and Andreassi told plaintiff on multiple occasions that once the PFA was resolved he could resume serving warrants.  The initial PFA was extended through February 23, 2018.  Plaintiff did resume serving warrants for the office after the PFA expired.

16

Plaintiff did security work in addition to performing his constable duties.  Plaintiff was part owner of Right Arm Security and Investigations when Petrosky filed the charges.  As part of arranging security for Slippery Rock School District, the school district obtained criminal background investigation reports on all of the personnel at Right Arm Security.  The criminal complaint filed against plaintiff appeared on the report.  School district officials advise another part-owner of Right Arm Security that plaintiff was not to work on school property because of those charges.  As a result, plaintiff was deprived of the ability to work up to 40 hours a week at the school by filling in for other Right Arm Security employees when they needed to be off.

Defendants move for summary judgment on each of plaintiff's remaining claims.  They maintain that the objective facts and circumstances confronting Petrosky when he arrived at the school on February 21, 2017, gave rise to probable cause to arrest plaintiff, and as a result his Fourth Amendment claims for false arrest and unlawful seizure fail.  Further, plaintiff's due process/malicious prosecution claims cannot survive summary judgment regardless of whether they are examined under the Fourth or Fourteenth Amendments because plaintiff did not suffer a sufficient seizure of his person or deprivation of liberty.  And from their perspective, Petrosky is entitled to qualified immunity in any event because a reasonable officer would have believed that probable cause for the arrest existed.  In addition, plaintiff's state law claim for malicious prosecution fails because Petrosky had probable cause to file the charges and defendant Manor Township is assertedly entitled to immunity under Pennsylvania's Political Subdivision Tort Claim Act as to any remaining state law claim plaintiff is attempting to maintain against it.  Thus, defendants content that they are entitled to summary judgment on all of plaintiff's remaining claims.

17

In response, plaintiff maintains that Petrosky lacked probable cause to arrest him, seize his weapon and/or file charges against him.  And even assuming there is some question about the existence of probable cause to support Petrosky's actions, material issues of fact remain for the trier of fact.  Further, the right to be free from arrest except upon the existence of probable cause was clearly established because plaintiff had both a Second Amendment and a statutory right to carry his service weapon, thereby defeating any claim of qualified immunity.  In addition, plaintiff was taken to the station and shackled in the holding cell on the day of arrest and thus was seized within the meaning of the Fourth Amendment.  He then was subjected to the filing of charges resulting in the "seizure" of plaintiff's weapons certification, which assertedly constituted the loss of a "property interest."  From that "seizure" a loss of a liberty interest ensued.  According to plaintiff, these seizures are sufficient grounds to maintain his malicious prosecution and due process claims under the Fourth and Fourteenth Amendments.  Finally, the loss of plaintiff's weapons certificate falls within an exception to the Political Subdivision Tort Claim Act, thereby defeating any claim to immunity.

Although plaintiff maintains that material issues of fact remain as to whether Petrosky lacked probable cause to arrest him, seize his weapon, and/or file charges, thereby violating plaintiff's Fourth Amendment rights to be free from unreasonable arrest and seizure of property and Fourteenth Amendment right to due process, the applicable standards of review dictate that defendants are entitled to summary judgment on the claims which turn on the existence or lack of probable cause.

In general, § 1983 does not itself create substantive rights, but instead provides a vehicle for vindicating a violation of a federal right.[9]  Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995).  A cause of action under § 1983 has two elements: a plaintiff must prove (1) a violation of a right, privilege or immunity secured by the constitution and laws of the United States (2) that was committed by a person acting under color of state law.  Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996); Kelly v. Borough of Sayreville, 107 F.3d 1073, 1077 (3d Cir. 1997); Berg v. Cty. of Allegheny, 219 F.3d 261, 268 (3d Cir. 2000) ("The Plaintiff must demonstrate that a person acting under color of law deprived him of a federal right." ) (citing Groman, 47 F.3d at 633).

Here, it cannot be disputed that Petrosky acted under color of law.  Thus, this element is not in dispute.

Second, "the exact contours of the underlying right said to have been violated" must be determined.  Berg, 219 F.3d at 268 (citing City of Sacramento v. Lewis, 523 U.S. 833, 841 n. 5 (1998)).  Plaintiff alleges that he was subjected to arrest and malicious prosecution in the absence of probable cause in violation of the Fourth and Fourteenth Amendments.

The Fourth Amendment prohibits an arrest of a citizen except upon probable cause. Rogers v. Powell, 120 F.3d 446, 452 (3d Cir. 1997) (citing Orsatti v. New Jersey State Police, 71 F.3d 480, 482 (3d Cir. 1995) (citing Papachristou v. City of Jacksonville, 405 U.S. 156 (1972)).

---

[9] Section 1983 creates liability  against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.

"Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." Rogers, 120 F.3d at 453 (citing Orsatti, 71 F.3d at 483). The elements of false arrest include: 1) an arrest made without probable cause or 2) one made by someone without privilege to arrest. Brockington v. City of Philadelphia, 354 F. Supp.2d 563, 572 (E.D. Pa. 2005) (citing Patzig v. O'Neil, 577 F.2d 841, 848 (3d Cir.1978) and Montgomery v. De Simone, 159 F.3d 120, 124 (3d Cir.1998)).

Defendants highlight many aspects of the record which they contend establish probable cause for plaintiff's arrest and the seizure of his service weapon. They assert that given plaintiff's stated purpose for entering the school while displaying a pistol on his hip, the lack of any constable insignia on his clothing, the fact that he was not on school grounds to perform any official constable duty, the existence of the PFA and the reactions of school staff to plaintiff's arrival and request to release his daughter, the objective facts gave Petrosky probable cause to arrest plaintiff on February 21, 2017, and seize his service weapon; as a result, defendants assert that plaintiff cannot proceed with his Fourth Amendment claim for false arrest and unlawful seizure.

In response, plaintiff maintains the Petrosky lacked probable cause to arrest plaintiff. He knew plaintiff was a constable and generally authorized to carry his service weapon, which assertedly would extend to restricted areas such as school property. Further, plaintiff did not engage in disruptive conduct involving the use of his service weapon, such as brandishing it or threatening someone with it. He merely carried the weapon on his person because he had prepared for work that day and had his light duty belt on. He dressed in clothes that were part

of his regular work attire.  He also had his badge on him and used it to identify himself when questioned.  Thus, Petrosky lacked probable cause to arrest plaintiff for any crime and, in the alternative, any question as to the existence of probable cause is an issue for the jury to decide.

In general, the question of probable cause in a section 1983 damages suit is a question of fact for the jury, unless there is only one reasonable determination possible.  Montgomery v. De Simone, 159 F.3d 120, 124 (3d Cir. 1998); Ingram v. Lupas, 353 F. Appx. 674, 677-78 (3d Cir. 2009).  In this context "summary judgment is only appropriate if 'a reasonable jury could not find a lack of probable cause.'"  Dempsey v. Bucknell University, 834 F.3d 457, 467 (3d Cir. 2016) (quoting Montgomery, 159 F.3d at 124 and citing Deary v. Three Un-Named Police Officers, 746 F.2d 185, 191 (3d Cir. 1984)).   In other words, "a district court may conclude that probable cause did exist as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding, and may enter summary judgment accordingly."  Estate of Smith v. Marasco, 318 F.3d 497, 514 (3d Cir. 2003) (internal quotation and citation omitted).

"An arrest may violate the standards of the Fourth Amendment . . . if made without probable cause to believe that a crime has been committed. "  Barna v. City of Perth Amboy, 42 F.3d 809, 819 (3d Cir. 1994) (citing Patzig v. O'Neil, 577 F.2d 841 (3d Cir.1978) and Gerstein v. Pugh, 420 U.S. 103, 111 (1975)).  But articulating an exact definition of probable cause is not possible.  This is because the existence of probable cause is a commonsense concept that deals with "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."  Ornelas v. United States, 517 U.S. 690, 695 (1996) (quoting  Illinois v. Gates, 462 U.S. 213, 231 (1983)).  As such, the probable

cause standard is "not readily, or even usefully, reduced to a neat set of legal rules."  Id. at 695-96 (quoting Gates, 492 U.S. at 232).  Nor is it a "finely-tuned" standard, comparable to the standards of proof beyond a reasonable doubt or proof by a preponderance of the evidence.  Id. To the contrary, it is a fluid concept that takes its substantive content from the particular context in which the standard is being employed and assessed.  Id. at 696 (citing Gates, 462 U.S. at 232; Brinegar v. U.S., 338 U.S. 160, 175 (1949) ("The standard of proof [for probable cause] is . . . correlative to what must be proved").

"Courts employ an objective and fact intensive test to determine whether probable cause existed at the time of the arrest." Fitzgerald v. County of Lehigh, 381 F. Supp.3d 443, 456 (E.D. Pa. 2019) (citing Dempsey, 834 F.3d at 467-68).   In general, probable cause exists when the facts and circumstances within the arresting officer's knowledge give rise to a "fair probability" that the suspect has committed or is committing a crime.  Wilson v. Russo, 212 F.3d 781, 789 (3d Cir. 2000); Sherwood v. Mulvihill, 113 F.3d 396, 401 (3d Cir. 1997) ("[p]robable cause exists if there is a 'fair probability' that the person committed the crime at issue"); Orsatti v. New Jersey State Police, 71 F.3d 480, 483 (3d Cir. 1995) (Probable cause exists "when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed.").

While "the probable cause standard is incapable of precise definition or quantification," Maryland v. Pringle, 540 U.S. 366, 371 (2003), all determinations must be based on specific facts and circumstance that would warrant a prudent individual to believe there is a fair probability that an offense has been or is being committed.  See Wright v. City of Philadelphia,

409 F.3d 595, 601-602 (3d Cir. 2005) (citing Hill v. California, 401 U.S. 797, 804 (1971)

("Sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth

Amendment . . . .")); Gates, 462 U.S. at 246 ("probable cause does not demand the certainty

we associate with formal trials.").  And while it requires more than "mere suspicion," Orsatti,

71 F.3d at 482-83, it does not "require the same type of evidence of each element of the

offense as would be needed to support a conviction."  Wright, 409 F.3d at 602 (quoting Adams

v. Williams, 407 U.S. 143, 149 (1972)).  Thus, the evidentiary standard for probable cause is

"significantly lower than the standard which is required for conviction."  Wright, 409 F.3d at

602 (citing Michigan v. DeFillippo, 443 U.S. 31, 36 (1979)).

Probable cause determinations require an analysis of the totality of the circumstances.

Gates, 462 U.S. at 233.  A determination of reasonableness under the Fourth Amendment may

be based on factors which by themselves are susceptible of innocent explanation.  See U.S. v.

Sokolow, 490 U.S. 1, 10 (1989) ("We noted in Gates, 462 U.S. at 243 244, n. 13 . . . that

'innocent behavior will frequently provide the basis for a showing of probable cause,' and that

'[i]n making a determination of probable cause the relevant inquiry is not whether particular

conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of

noncriminal acts.'").  And such determinations "need not rule out a possibility of innocent

conduct."  Arvizu, 534 U.S. at 277 (citing Illinois v. Wardlow, 528 U.S. 119 (2000)).

Furthermore, the crime with which a suspect eventually is charged does not control the

probable cause analysis.  Wright, 409 F.3d at 602.  Instead, "[p]robable cause need only exist

as to any offense that could be charged under the circumstances."  Barna, 42 F.3d at 819.  And

the critical point of inquiry is the moment of arrest, not subsequent points in time when

additional information has or might have come to light.  See Wright, 409 F.3d at 602 (An arrest

is made with probable cause if "at the moment the arrest [is] made . . . the facts and

circumstances within [the officers'] knowledge and of which they had reasonably trustworthy

information were sufficient to warrant a prudent man in believing that [the suspect] had

committed or was committing an offense.") (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)); cf.

Dempsey, 834 F.3d 469 ("in reviewing probable cause determinations made by law

enforcement, the role of the courts is not that of the much-maligned "Monday morning

quarterback" whose critiques are made possible only by the benefits of hindsight.").  "In other

words, the constitutional validity of the arrest does not depend on whether the suspect actually

committed any crime."  Wright, 409 F.3d at 602 (citing Johnson v. Campbell, 332 F.3d 199,

211 (3d Cir. 2003).

　　　　In undertaking a probable cause determination, the starting point is the elements of the

crime or crimes at issue.  Wright, 409 F.3d at 602.  Petrosky identified three criminal offenses

in his exchange with plaintiff: 1) possessing a weapon on school property; 2) violation of the

Protection From Abuse Order; and 3) disorderly conduct.  Plaintiff was charged with

possession of a weapon on school property in violation of 18 Pa. C. S. § 912(b) and disorderly

conduct in violation of 18 U.S.C. § 5503(c).  Pennsylvania defines these crimes as follows:

　　　　§ 912. Possession of weapon on school property

　　　　(a) Definition. - Notwithstanding the definition of "weapon" in section 907
(relating to possessing instruments of crime), "weapon" for purposes of this section shall
include but not be limited to any . . . firearm . . . or implement capable of inflicting
serious bodily injury.

(b) Offense defined. - A person commits a misdemeanor of the first degree if he possesses a weapon in the buildings of, on the grounds of . . . any elementary or secondary publicly-funded educational institution . . . .

(c) Defense. - It shall be a defense that the weapon is possessed and used in conjunction with a lawful supervised school activity or course or is possessed for other lawful purpose.

18 Pa. C. S. § 912.

§ 5503. Disorderly conduct

(a) Offense defined. - A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:
(1) engages in . . . threatening . . . behavior
*   *   *
(b) Grading. - An offense under this section is a misdemeanor of the third degree if the intent of the actor is to cause substantial harm or serious inconvenience, or if he persists in disorderly conduct after reasonable warning or request to desist. Otherwise disorderly conduct is a summary offense.
(c) Definition. - As used in this section the word "public" means affecting or likely to affect persons in a place to which the public or a substantial group has access; among the places included are . . . schools . . . .

18 Pa. C. S. § 5503.

The Pennsylvania courts have held that to establish a violation of § 912, the Commonwealth must prove that 1) the defendant knowingly, intentionally or recklessly possessed a weapon 2) in "an elementary or secondary publicly-funded educational institution." Commonwealth v. Giordano, 121 A.3d 998, 1005 (Pa. Super. 2015). Importantly, § 912 is not a strict liability offense and the Commonwealth must meet its burden in proving a defendant acted with the requisite state of mind when possessing a weapon on school property. Id. at 1006; accord Bolden v. Chartiers Valley Sch. Dist., 869 A.2d 1134, 1138 (Pa. Cmwlth. 2005) ("These factors tend to suggest that Section 912 is not a strict liability offense, particularly

because the General Assembly did not explicitly state its intent to make it one.  Moreover, the accompanying penalty for a violation of Section 912 is strikingly severe . . . .").

The crime of disorderly conduct "embraces activity which disturbs the peace and dignity of a community." Commonwealth v. Greene, 189 A.2d 141, 144 (Pa. 1963).  Proving mere inconvenience, noise or public annoyance on the part of the defendant is not enough.  Id. To prove the offense the Commonwealth must show a defendant knowingly or recklessly broke "the public peace" by "act[ing] in a disorderly manner." Id. at 145-46.

"Under the statute, whether a defendant's words or acts rise to the level of disorderly conduct hinges upon whether they cause or unjustifiably risk a public disturbance." Commonwealth v. Hock, 728 A.2d 943, 946 (Pa. 1999).  "The cardinal feature of the crime of disorderly conduct is public unruliness which can or does lead to tumult and disorder." Id. (quoting Commonwealth v. Greene, 189 A.2d 141, 144 (Pa. 1963).

Against the above backdrop, the critical inquiry is whether the record establishes that at the time Petrosky seized plaintiff's service weapon and took him to the police station for follow-up, the objective facts within Petrosky's ken gave rise to a reasonable belief that there was a fair probability that plaintiff had committed either of these offenses.  We conclude that they did.  In other words, the objective facts as they then existed did give rise to probable cause to believe that plaintiff had committed both offenses.

The following objective facts were known to Petrosky at the critical moment in time. Plaintiff was an elected constable who performed constable duties in the area.  Laurie recently had obtained a Protection From Abuse Order against plaintiff.  Plaintiff went to the school midday on February 21, 2017, to take his daughter out of school.  He did so without providing

advanced notice to school officials, which was the school's established policy for taking children out of school during normal school hours.

A few days prior to the incident Laurie had informed school officials that plaintiff was threatening to come to the school, remove his daughter, and keep her from Laurie. The daughter had relayed her concerns about the ongoing custody battle between her parents and the threats being made by plaintiff. School officials agreed to notify Laurie if plaintiff arrived unannounced and tried to remove his daughter from school.

Plaintiff arrived at school wearing khakis, a black polo shirt and his light duty service belt with a pistol holstered and strapped to his right side. His clothing did not contain an insignia reflecting that he was a constable.

Upon entering the school, the school officials encountering plaintiff became alarmed because, without prior notice, he arrived midday and announced he was there to pick up his daughter. Wasson asked if plaintiff was "security" and plaintiff said no. Noticing that Wasson kept looking at him, plaintiff displayed his constable identification but did not indicate he was there to perform some official task as a constable. Wasson continued to be really concerned by plaintiff showing up armed and requesting to take his daughter from school.

Wasson left plaintiff's presence and telephoned the school principal and Laurie and advised them of the situation. The principal telephoned the head of school security, Bramlet, and advised that plaintiff was at the school with a firearm, there was an active PFA against him, and he had come to the school without prior notice to pick up his daughter. Bramlet telephoned Petrosky and relayed this same information. Laurie telephoned 911 and dispatch requested Petrosky to respond to the school.

27

Petrosky arrived at the school.  He frequently went to the school as part of his official duties and generally was familiar with the school's staff.  Petrosky was aware of the PFA against plaintiff at that time, but had not reviewed its specific content.

Petrosky was met by Wasson and she informed him that plaintiff was armed and there to pick up his child.  In briefing Petrosky, Wasson appeared to be very worried and nervous about the situation, which was not her usual demeanor when interacting with Petrosky. Wasson advised that she could see the gun on his belt and kept looking to see if he had identification on him.  Wasson advised that the situation was very disturbing because plaintiff was there with a gun demanding to pick up his child and the principal was not present.[10] Bramlet briefed Petrosky about what had transpired.  Petrosky then asked plaintiff to remove his pistol and place it on a nearby shelf, which he did.  Petrosky then secured the pistol in the cruiser and returned for follow-up questioning.

Petrosky asked plaintiff if he was at the school on official business, and plaintiff indicated that he was on school property to pick up his child.  Petrosky asked plaintiff if he was serving warrants as a constable before going to the school that morning and plaintiff said no. Plaintiff appeared to Petrosky to be somewhat distraught by the situation.

Petrosky returned to the school and spoke to Laurie and her mother, both of whom were upset about plaintiff's conduct.  Petrosky asked if Laurie had made threats about harming the children, and she and her mother became extremely upset about the situation and the way plaintiff was treating them.  Petrosky then asked Bramlet if plaintiff had been employed as a

---

[10] Petrosky interviewed Wasson both before plaintiff was taken to the station and afterwards and she related the same information to Petrosky on each occasion.

school security officer by his operation anywhere in the school district.  Bramlet said plaintiff had worked in other capacities in the past but was not employed by Bramlet's security service in any capacity at that time.  Petrosky then advised plaintiff that he was taking him in, removed plaintiff from the school in a discrete manner and drove him to the station.

The above information and circumstances existed and were made known to Petrosky before he took plaintiff to the station and seized his service weapon.  While plaintiff takes issue with the materiality of the above information and/or claims he lacks firsthand knowledge about much of the information relayed to Petrosky outside plaintiff's presence, plaintiff does not advance actual evidence to contradict in any adequate manner the information Petrosky observed and became aware of after arriving at the school.  For example, plaintiff challenges the reaction of school officials to his appearance and presence on school property as being the product of hypersensitive imaginations or irrational fears (presumably about weapons) and denies the materiality of all such concerns and emotional reactions.  He likewise denies the substance of any of the information Petrosky learned or observed from investigating the situation after arriving and speaking to those involved on the grounds that he (plaintiff) has no firsthand knowledge of what Petrosky observed or learned from speaking to Bramlet, Wasson and the other individuals who were at the school.

The issue thus presented is whether the above-referenced information made available to and perceived by Petrosky can straightforwardly be considered in determining whether Petrosky had sufficient justification to remove plaintiff from the school and seize his weapon. In other words, can the general challenges to this information by plaintiff create material issues of fact or otherwise require that a jury consider the question of whether probable cause existed?

Our Court of Appeals appears to have answered this question by requiring a showing that actually creates material disputes about the claimed information possessed by the officer and/or the observations and inferences he or she made/drew at the time.  Merely attempting to discount such information pursuant to the summary judgment standard will not suffice to defeat an otherwise supported showing of probable cause.

As the court in Dempsey observed, "[t]here is a tension inherent in evaluating probable cause at the summary judgment stage."  Dempsey, 834 F.3d at 468.  The standard at summary judgment asks whether there is a genuine dispute as to any material fact while viewing the evidence "in the light most favorable to the non-moving party."  Id. (citing Reedy, 615 F.3d at 210).  "On the other hand, the probable cause standard by definition allows for the existence of conflicting, even irreconcilable, evidence."  Id. (citing Wright, 409 F.3d at 603).  In reconciling these competing principles, the court held:

> While it is axiomatic that at the summary judgment stage, we view the facts in the light most favorable to the nonmoving party, it does not follow that we exclude from the probable cause analysis unfavorable facts an officer otherwise would have been able to consider.  Instead, we view *all* such facts and assess whether any reasonable jury could conclude that those facts, considered in their totality in the light most favorable to the nonmoving party, did not demonstrate a "fair probability" that a crime occurred.  Only then would the existence of conflicting evidence rise to the level of a "genuine dispute as to any material fact" such that summary judgment would be inappropriate.  Thus, where the question is one of probable cause, the summary judgment standard must tolerate conflicting evidence to the extent it is permitted by the probable cause standard.

Id.

Here, the probable cause standard permits the consideration of the facts and information that Petrosky came to understand when he responded to the school on February 21, 2017.  They included that plaintiff came to the school midday in a personal capacity while armed, and,

without advanced notice to the school and contrary to its policy, demanded to have his child released to him.  There was an active PFA against plaintiff.  School officials had been advised by plaintiff's estranged wife and his child that he had been threatening to go to the school and take his child so his estranged wife could not see the child.  School officials became alarmed when plaintiff appeared with a firearm strapped to his side and notified school security who in turn notified the police.  Investigation by the township police officer indicated plaintiff had not been performing any official duties as a constable before he came to the school, did not claim to have any official duty to perform at the school, and was not working school security at that time. Plaintiff was openly armed and explaining that recent threatens from the mother required that he take his daughter from school for safety purposes.  Plaintiff did not have any official insignia displayed on his outward appearance and the school guidance counselor became concerned and stressed due to the presence of plaintiff's pistol and the domestic situation between the parents. Her distress and concern became apparent to Petrosky when she briefed him about what had transpired.

These objective facts are sufficient to establish a fair probability that plaintiff had knowingly possessed a weapon on school property and he had recklessly created a situation that threatened an immediate breach of the peace.  His arguments to the contrary are specious.

Plaintiff argues that the holding in Goslin made unequivocally clear that his lawful possession of his service weapon as a constable was not a violation of the state law prohibiting the possession of weapons on school property.  But Goslin cannot be construed as establishing such an expansive bright-line rule.

In Goslin, the defendant attended a teacher/parent conference after his son was suspended from elementary school for bringing a knife to school.  156 A.3d at 315.  The defendant worked as a carpenter and proceeded directly to the school after finishing his work.  When he arrived at the conference, he possessed a small pocketknife that he used "not only at work as a carpenter, but also to sharpen pencils, whittle sticks with his sons, and 'open tuna cans when my wife forgets to pack me a tuna can opener.'"  Id.  Apparently to make a point at the conference, the defendant "removed the knife from his pocket and placed it forcefully on a conference table around which the meeting attendees were seated and asked whether he would be arrested."  Id.  Subsequently he was arrested and charged with possession of a weapon on school property and terroristic threats.  After a bench trial, the defendant was convicted of violating the prohibition at 18 Pa. C. S. § 912(b) prohibiting weapons on school property and sentenced to one year of probation.  Id. at 316.

In reaching its verdict, the trial court rejected the defendant's argument that the "other lawful purpose" clause in § 912(c) extended to possession of a weapon for any other lawful purpose; it construed the provision to be limited to a "lawful purpose [that is] related to the reason why one is on school property."  Id.  The defendant appealed, contending the trial court erred in limiting the "possession for any other lawful purpose" defense to a possession connected to a school activity undertaken at the particular moment in time when the offense allegedly occurred.

On appeal, the Superior Court rejected the trial court's determination that the clause was vague and applied a plain language interpretation of the statute.  After examining the common dictionary meanings of the central three words in the phrase, it opined: "[a]ccordingly, for

32

purposes of the instant case, the plain meaning of the phrase 'other lawful purpose' is an aim or goal different from, or in addition to, an aim or goal described in the first clause of Section 912(c), *i.e.*, in conjunction with 'a lawful supervised school activity or course.'"  Applying this construction, it held:

> Contrary to the trial court's conclusion, the "other lawful purpose" language does not restrict the defense provided in Section 912(c).  Instead, the phrase does just the opposite: it expands the defense to include any additional or different lawful reason not otherwise mentioned in the first clause of Section 912(c), regardless of whether it is school-related. To conclude otherwise, would make "possessed for other lawful purpose" redundant with "possessed and used in association with a lawful supervised school activity or course."

Goslin, 156 A.3d at 317-18.

While Goslin did provide plaintiff with a defense to the § 912(b) charge, it is not the panacea plaintiff makes it to be.  Critically, it cannot be overlooked that possession of a weapon on school property for "other lawful purpose" as set forth in § 912(c) is an affirmative defense to the criminal offense established in § 912(b).  Several principles relevant to the matters under consideration flow from this.

First, the Supreme Court repeatedly has emphasized that innocent behavior often will provide the basis for a showing of probable cause.  Gates, 462 U.S. 243.  And it has extended this principle into the context of brief investigatory stops.  See United States v. Sokolow, 490 U.S. 1, 8-9 (1989) (the fact that any one of the several factors considered by the officer could have been consistent with innocent conduct did not preclude consideration of their cumulative effect in establishing a basis for further investigatory inquiry).  And our Court of Appeals has acknowledged this principle as well.  See United States v. Henley, 941 F.3d 646, 653 (3d Cir. 2019) (in making an assessment of probable cause or reasonable suspicion, a law enforcement

officer is not required to "rule out the possibility of innocent conduct").  This principle of law is embedded in the law of Pennsylvania as well.  Cf. Commonwealth v. Edwards, 2019 WL 2068679, *2 (May 10, 2019) ("The evidence 'need not preclude every possibility of innocence . . . .  The finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part, or none of the evidence.'" (quoting Commonwealth v. Thomas, 194 A.3d 159, 166 (Pa. Super. 2018)).

Second, under Pennsylvania law it is clear that the finder of fact may reject a proffered affirmative defense under § 912(c) and conclude that the Commonwealth has met its burden to prove a weapon was possessed in violation of the statute.  See Edward, 2019 WL 2068679 at *3 (reasoning that it was the purview of the finder of fact to reject the defendant's statement that he possessed a knife on school property for the purposes of self-defense and the Commonwealth had no duty to introduce additional evidence rebutting the statement if the Commonwealth believed "its existing evidence was sufficient to refute the defense") (quoting Commonwealth v. Weis, 611 A.2d 1218, 1225 (Pa. Super. 1992)).  In this regard, possession of a weapon for a lawful purpose immediately prior to its possession on school property does not *ipso facto* equate to lawful possession at the time of the charged offense.  Id. at *3 n.10 ("Were we to accept Appellant's argument, it would be lawful for every student to carry a weapon to school so long as they had a lawful purpose for its possession *at some point* before bringing the weapon to school. This absurd result cannot be what the legislature intended.  See 1 Pa. C. S. A. § 1922 (when ascertaining the legislative intent behind a statute, we presume 'the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable'")).

Here, plaintiff seeks to avail himself of the same type of fallacious reasoning – that is, because plaintiff possessed the weapon prior to going to the school for a lawful purpose (to wit, as part of his performance of his constable duties), Petrosky necessarily was required to recognize that purpose and conclude that no violation of § 912(b) had occurred.  But neither the substantive law of Pennsylvania nor the law governing the issue of probable cause currently before the court mandate such a result.  To the contrary, Petrosky was free to evaluate the totality of the facts and circumstances presented in his investigation and decide whether there was a fair probability that plaintiff possessed his pistol on school grounds at that moment in time for some purpose consistent with the statutory prohibition.  For example, he could have reasoned that plaintiff possessed the weapon on school property at that time for the same reason that Wasson believed he did so: to intimidate school staff not to question his request that his daughter be released to him.  This was certainly an inference that was supported by the facts and circumstances confronting Petrosky, and it is apparent that he drew that inference or one very similar to it.  After all, one of the bases Petrosky referenced when removing plaintiff from school property and taking possession of his service weapon was a violation of "disorderly conduct," *i.e.*, recklessly creating a situation likely to result in a breach of the peace in a public school.[11]

---

[11]  Plaintiff's contention that Petrosky had to prove plaintiff had the "intent to cause public inconvenience" in order to establish disorderly conduct suffers from similar logical shortcomings.  Plaintiff asserts he merely attempted to pick up his daughter and had no intent to cause alarm or annoyance.  He showed his constable identification when there was any question about him being armed and was polite to staff.  Further, he did not brandish his weapon, threaten anyone or cause any inconvenience to the school that was not the result of an overreaction by Wasson due to misinformation spread by plaintiff's estranged wife.  While plaintiff may well be able to prove each of these propositions, under the plain language of the statute the Commonwealth can prove disorderly conduct in violation of § 5503(a)(1) by a showing that the defendant recklessly created a risk of public inconvenience by knowingly engaging in

"The probable cause inquiry looks to the totality of the circumstances; the standard does not require that officers correctly resolve conflicting evidence or that their determinations of credibility, were, in retrospect, accurate." Wright, 409 F.3d at 603.  The existing facts and perceived circumstances available at the time Petrosky seized plaintiff's service pistol and removed him from the school provided probable cause to believe plaintiff had violated Pennsylvania law prohibiting weapons on school property and disorderly conduct.  And more importantly, "the evidence, viewed most favorably to [plaintiff], reasonably would not support a contrary factual finding" because plaintiff's counter evidence seeks to raise an affirmative defense and fails to undermine meaningfully or sufficiently dispute the objective facts and reasonable inferences supporting the existence of probable cause.  Dempsey, 834 F.3d 468.  Consequently, defendants are entitled to summary judgment on plaintiff's claim for false arrest in violation of the Fourth Amendment.

Even assuming for the sake of argument that plaintiff proffered sufficient evidence to permit a finding that a reasonable officer could have found the lack of probable cause at the time of the seizure and arrest, the doctrine of qualified immunity provides Petrosky with a complete defense and immunity from suit.  The doctrine of qualified immunity provides that "government officials performing discretionary functions . . . are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of

---

threatening behavior.  Such a showing requires much less than the intentional conduct posited by plaintiff and the question is whether the facts and circumstances available to Petrosky on February 21, 2017, would have made a reasonable officer believe there was a fair probability that plaintiff recklessly created a risk of breaching the public peace by engaging in conduct that was sufficiently threatening.  The record demonstrates unequivocally that there was probable cause to believe he had done so.

which a reasonable person should have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Under this doctrine government officials are immune from suit in their individual capacities unless, "taken in the light most favorable to the party asserting [a deprivation of a constitutional violation resulting in harm or injury], . . . the facts alleged show the officer's conduct violated a constitutional right" and "the right was clearly established" at the time of the deprivation. Saucier v. Katz, 533 U.S. 194, 201 (2001).

Qualified immunity is "an entitlement not to stand trial or face the burdens of litigation." Saucier, 533 U.S. at 200 (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). A government official performing discretionary functions is immune from claims for damages unless the evidence of record as read in the light most favorable to the non-moving party will support findings that (1) the official violated the plaintiff's constitutional rights, and (2) the constitutional right that was violated was clearly established. Id. at 201. The courts retain discretion in deciding which of the two prongs of this analysis should be addressed first. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

Qualified immunity is an affirmative defense and the burden of proving the prerequisites for its application rests with the party seeking to invoke it. Thomas v. Independence Twp., 463 F.3d 285, 292 (3d Cir. 2006); Hicks v. Feeney, 850 F.2d 152, 159 (3d Cir. 1988). "The issue of qualified immunity is generally a question of law, although a genuine issue of material fact will preclude summary judgment on qualified immunity." Giles v. Kearney, 571 F.3d 318, 326 (3d Cir. 2009). In deciding qualified immunity questions at summary judgment, a court must view the facts in the light most favorable to the plaintiff. Id.

The doctrine "balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231; accord Burns v. Pa. Dept. of Corrections, 642 F.3d 163, 176 (3d Cir. 2011).  And where its protections are appropriate, the immunity "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Pearson, 555 U.S. 231 (internal quotation omitted).  Thus, when properly applied, qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

Defendants assert Petrosky is entitled to qualified immunity as to all aspects of plaintiff's Fourth Amendment claim because plaintiff cannot establish a violation of the Fourth Amendment and preexisting law did not clearly identify Petrosky actions as unconstitutional under the circumstances confronting him in any event.

Plaintiff argues that Petrosky's invocation of qualified immunity fails under Andrews v. Scuilli, 853 F.3d 690, 705 (3d Cir. 2017), because (from plaintiff's perspective), it would have been clear to a reasonable officer that Petrosky's conduct violated a clearly established constitutional right.  Plaintiff notes his right to bear arms under the Second Amendment and his right to carry a weapon on to school property by state statute.  These rights purportedly extend to the right to be free from a seizure of his service weapon under the Fourth Amendment pursuant to the analysis set forth in Andrews.  Thus, from plaintiff's perspective, the second prong of the qualified immunity analysis assertedly tilts in his favor, and the settled law makes

38

clear that his right to be free from unreasonable seizure under the Fourth Amendment under the attendant circumstances was sufficiently established.

Under the first prong of a qualified immunity analysis, the Fourth Amendment constitutional right to be free from arrest except upon the existence of probable cause generally was established.  As relevant here, "[a]n arrest may violate the standards of the Fourth Amendment if . . . made without probable cause to believe that a crime has been committed." Barna, 42 F.3d at 819 (quoting Patzig v. O'Neil, 577 F.2d 841 (3d Cir. 1978) and Gerstein v. Pugh, 420 U.S. 103, 111 (1975)).  Thus, the right as a general matter is firmly established.  See e.g., Andrews, 853 F.3d at 705 ("[T]here is no question that . . . the right to be free from arrest except on probable cause, was clearly established" at the time of [the defendant's] arrest.) (citing Orsatti, 71 F.3d at 483).

The second prong of the qualified immunity analysis asks whether "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018); James v. New Jersey State Police, 957 F.3d 165, 169 (3d Cir. 2020) (same) (quoting Wesby, 138 S. Ct. at 589). The purpose of this inquiry is to account for "the reality that 'reasonable mistakes can be made as to the legal constraints on particular police conduct.'" Hickman v. Borough, 2017 WL 1197806, at *11 (D.N.J. Mar. 31, 2017) (quoting Santini, 795 F.3d at 418).

 This prong of the qualified immunity standard inverts the standard applicable at summary judgment by requiring that "there can be no liability on the part of the arresting officer unless 'no reasonably competent officer' would conclude that probable cause existed." Dempsey, 834 F.3d at 468 n.6 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).  This

assessment involves "an 'objective (albeit fact-specific) question,' under which '[an officer]'s subjective beliefs . . . are irrelevant." James, 957 F.3d at 169 (quoting Anderson v. Creighton, 483 U.S. 635, 641 (1987)).  The inquiry is undertaken from the perspective of a reasonable officer, and "only the facts that were knowable to the defendant officer" are taken into account. Id. (quoting White v. Pauly, -- U.S. --, 137 S. Ct. 548, 550 (2017) (citation omitted).

A plaintiff might be able to show that a right is clearly established if the violation in question "[is] 'obvious.'"  Id. (citing Brosseau v. Haugen, 543 U.S. 194, 199 (2004) (quoting Hope v. Pelzer, 536 U.S. 730, 738 (2002)).  For example, an arrest warrant predicated on an affidavit riddled with misleading assertions and failing to supply important omitted facts, which in combination create a substantial question about the sole witness's credibility and reliability, raises a material issue of whether probable cause existed for the warrant and thus creates a scenario where "it would be clear to a reasonable officer that [the defendant officer's] conduct was unlawful in the situation he confronted."  Andrews, 853 F.3d at 705.

Otherwise, "in most cases, a plaintiff must show that a right is clearly established because 'the violative nature of [the] particular conduct [was] clearly established.'"  James, 957 F.3d at 169 (quoting Ziglar v. Abbasi, -- U.S. --, 137 S. Ct. 1843, 1866 (2017) (quoting Mullenix, 136 S. Ct. at 308)).  In other words, "'settled law' . . . must 'squarely govern[ ]' the specific facts at issue."  Id. (quoting Wesby, 138 S. Ct. at 590 and Kisela v. Hughes, -- U.S. --, 138 S. Ct. 1148, 1152 (2018)).  This standard can be satisfied by identifying a case where an officer acting under similar circumstances was held to have violated the constitutional provision at issue.  James, 957 F.3d 169-70 (quoting White, 137 S. Ct. at 552).

In this setting "clearly established rights are derived either from binding Supreme Court and Third Circuit precedent or from a 'robust consensus of cases of persuasive authority in the Courts of Appeals.'"  Id. (quoting Bland v. City of Newark, 900 F.3d 77, 84 (3d Cir. 2018) (citation omitted)); accord Wesby, 138 S. Ct. at 589–90 ("To be clearly established, a legal principle must . . . [be] dictated by controlling authority or a robust consensus of cases of persuasive authority[.]").  A case directly on point is not required to show a right is clearly established, but "existing precedent must have placed the statutory or constitutional question beyond debate."  Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011).  In other words, "there must be sufficient precedent at the time of the action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited."  McLaughlin v. Watson, 271 F.3d 566, 572 (3d Cir. 2001).

There was insufficient precedent to place Petrosky on notice that seizing plaintiff's weapon and removing him from the school building was a clear violation of plaintiff's constitutional right to be free from unreasonable searches and seizures.  And as explained above, viewing the objective facts and circumstances available to Petrosky after he conducted his brief investigation of what had occurred at Lenape Elementary on February 21, 2017, and given the reasonable inferences he was entitled to draw from those facts and circumstances, Petrosky did have probable cause to transport plaintiff and seize his weapon.  But even assuming this assessment is erroneous, plaintiff has failed to identify any precedent that holds that a constitutional violation has occurred in a factually analogous scenario.

Plaintiff has not identified any Supreme Court case that recognizes under similar facts and circumstances that arresting a law enforcement officer for carrying a weapon onto school

property while engaging in the personal undertaking of removing a child therefrom while in the midst of a pending divorce and custody battle violates the Fourth Amendment.  Similarly, he has not cited to a robust collection of cases from the federal courts of appeals that support such a proposition.  To the contrary, he has come forward with a single case from the Superior Court of Pennsylvania which merely recognized his ability to raise an affirmative defense under the straightforward language of the statute.  And as explained above, the ability to raise such a defense does not displace the Commonwealth's ability to demonstrate that a defendant's possession at the critical moment was for a purpose other than the one that would have been lawful at some earlier point in time (or simply that the defendant did not possess the weapon for that specific lawful purpose at that moment in time).  Thus, plaintiff has failed to identify a robust consensus of precedent predicated on substantially similar facts and circumstances that gave every reasonable officer notice that proceeding with the removal of plaintiff and seizure of his handgun would constitute a violation of his constitutional rights.

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011).  And even where a clearly established constitutional right has been violated, if the officer's mistake as to what the law requires was reasonable, then qualified immunity shields the officer from liability. Carswell v. Borough of Homestead, 381 F.3d 235, 242 (3d Cir. 2004).  Applied in this manner, the doctrine "protects 'all but the plainly incompetent or those who knowingly violate the law.'" Ashcroft, 563 U.S. at 743 (quoting Malley, 475 U.S. at 341). Here, assuming the previous deficiencies in plaintiff's case can somehow be overlooked, plaintiff has done nothing more than demonstrate that Petrosky made a reasonable mistake

about the scope of the law as it related to plaintiff's conduct.  Consequently, Petrosky is entitled to qualified immunity for this reason as well.

Plaintiff also has failed to advance sufficient evidence to proceed with a malicious prosecution claim and/or a due process claim.  Plaintiff attempts to hedge his bets as to whether he is proceeding with a Fourth or Fourteenth Amendment claim at Count II.  He captioned the claim as one pursuant to the Fourteenth Amendment, but the averments of Count II advance a malicious prosecution claim.  Plaintiff's evidence is insufficient under either approach.

Defendants argue plaintiff's malicious prosecution claim fails under the Fourth Amendment because he cannot establish that an actionable "seizure" occurred as a result of the charges being filed.  And they add that to the extent plaintiff seeks to rely on the Fourteenth Amendment as the foundation for his malicious prosecution claim, the claim assertedly cannot proceed because claims for false arrest and unlawful seizure by law enforcement are analyzed under the Fourth Amendment and a plaintiff cannot fall back on the more generalized notions of due process when the Fourth Amendment jurisprudence fails to produce the desired outcome.  They add that any loss of liberty claimed by plaintiff under either the Fourth or the Fourteenth Amendments due to the suspension of his service weapon certification purportedly is not of a sufficient level to survive summary judgment.  Finally, defendants contend that in any event plaintiff did not generate sufficient evidence to support any claimed damages as a result of the charges.

Plaintiff counters that the malicious filing of a complaint resulted in the loss of his weapons certification.  This in turn diminished his ability to receive work as a constable as well as a private security guard.  His weapons certification was in substance a property right, so losing

43

that certification constituted a seizure under the Fourth Amendment and a loss of liberty to pursue one's chosen profession.  Because he lost his weapons certification as a result of Petrosky filing the complaint, plaintiff maintains that there was a "deprivation of liberty consistent with the concept of seizure" within the meaning of the Fourth Amendment.  And the material issues as to the constitutionality of his arrest, the seizure of his weapon, and the filing of charges under the Fourth Amendment, all resulting in the deprivation of his weapons certificate, dictate that plaintiff's Fourteenth Amendment claim for violation of due process be reserved for the factfinder as well.  Thus, plaintiff argues that his claim for Fourth Amendment malicious prosecution and his Fourteenth Amendment due process claim remain for trial.

As an initial matter, plaintiff's malicious prosecution claim must be analyzed under the Fourth Amendment rather than the more generalized notions of due process under the Fourteenth Amendment.  DiBella v. Borough of Beachwood, 407 F.3d 599, 602 (3d Cir. 2005) ("where 'a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process must be the guide for analyzing these claims.'") (quoting Albright v. Oliver, 510 U.S. 266, 271 (1994)); Black v. Montgomery County, 835 F. 358, 365 (3d Cir. 2016) (analyzing malicious prosecution claim under the Fourth Amendment as opposed to the Fourteenth Amendment because "it is the Fourth Amendment, and not substantive due process, under which [a malicious prosecution] claim must be judged.") (quoting Albright, 510 U.S. at 271).  Thus, plaintiff's attempt to invoke the Fourteenth Amendment as a basis for his malicious prosecution claim is misplaced and defendants are entitled to summary judgment on any such claim.

44

Moreover, plaintiff has failed to advance sufficient evidence to support findings in his favor on multiple elements of a malicious prosecution claim under the Fourth Amendment.  In order to establish a § 1983 malicious prosecution claim, a plaintiff must be able to satisfy the common law elements of a malicious prosecution claim.  Merkle v. Upper Dublin School District, 211 F.3d 782, 792 (3d Cir. 2000).  These are: "(1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; and (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice."  Id. (citing Hilfirty v. Shipman, 91 F.3d 573, 579 (3d Cir.1996)).  The constitutional component of the claim also requires a showing of a loss of liberty beyond simply showing an unlawful arrest.  Id. (citing Gallo v. City of Philadelphia, 161 F.3d 217, 225 (3d Cir.1998)); accord McKenna v. City of Philadelphia, 582 F.3d 447, 461 (3d Cir. 2009) (malicious prosecution claim premised on a violation of the Fourth Amendment includes as an element a showing that "(5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.") (citing Estate of Smith v. Marasco, 318 F.3d 497, 521 (3d Cir. 2003)); Johnson v. Knorr, 477 F.3d 75, 82 (3d Cir. 2007).

A Fourth Amendment malicious prosecution claim is "intended to redress [the] deprivation of liberty accompanying prosecution, not prosecution itself."  DiBella, 407 F.3d at 603; Gallo, 161 F.3d at 222–24 (citing Albright, 510 U.S. at 278-79).  "The claim arises from the prosecution, not the arrest.  The alleged seizure must emanate from the prosecution, and 'must occur chronologically after the pressing of charges.'"  Roberts v. Ceasar's Entertainment, Inc., 72 F. Supp.3d 575, 581 (E.D. Pa. 2014) (citing Basile v. Twp. of Smith, 752 F.Supp.2d 643, 659 (W.D. Pa. 2010)).  Thus, events that proceeded the initiation of prosecution, such as those

45

between the initial encounter with the police and the filing or initiation of formal charges, are not the proper focus of or basis for a malicious prosecution claim.  Id.

Plaintiff essentially points to two separate consequences of Petrosky's filing of charges at the magisterial district justice's office to satisfy the element of seizure: the restriction of his liberty in being required to report to magisterial court for a preliminary hearing on two occasions and the automatic suspension of his certification to carry his service weapon.  The formal required him to answer to the authority of the court, which he was not free to disregard, and the later diminished his ability to perform his duties as a constable because the state did not timely process his revised identification and he was unable to carry a weapon while the charges remained pending and for a short time thereafter until his certification was restored.

Neither of the identified liberty interests highlighted by plaintiff are sufficient.  First, the only actual restriction on his personal movement was a requirement that he appear for a preliminary hearing at the local magisterial district judge's office.  But to be sufficient to support a Fourth Amendment violation, a seizure must result in either pretrial custody or "some onerous types of pretrial, non-custodial restrictions." DiBella, 407 F.3d at 603.  And "[m]erely having to appear in court to answer charges does not qualify as a Fourth Amendment seizure." Roberts, 72 F. Supp.3d at 582-83 (citing Basile, 752 F.Supp.2d at 659–60 and DiBella, 407 F.3d at 603).  Thus, having to comply with the summons and appear at local court on two occasions is an insufficient restriction on plaintiff's liberty for the purpose of proceeding with plaintiff's federal prosecution claim.

Plaintiff's position on the temporary suspension of his certification to carry a service weapon equally is insufficient.  Plaintiff posits that with the loss of his certification he was

46

unable to serve warrants for the Armstrong County District Attorney's Office and the Slippery Rock School District precluded his security company from using plaintiff to perform security services at the school district. And because of each of these limitations, plaintiff supposedly lost the ability to carry on the occupation of being a constable.

The difficulty with advancing these two forms of restriction on plaintiff's activities is that they are not supported by the evidence of record. The record unequivocally reveals that the PFA order was the only reason the Armstrong District Attorney's Office stopped using plaintiff to serve warrants, and the PFA was in existence from January 31, 2017, through February 23, 2018. Plaintiff did not provide his services to any other county district attorney's office before, during or after the charges were filed, nor did he attempt to do so. Thus, the temporary suspension of his firearm certification had no effect on his ability to serve warrants for Armstrong County.

Plaintiff's claim that the suspension resulted in a loss of his ability to perform security services likewise is amorphas and insufficient. Plaintiff argues that his certification was a property right and losing it constituted a seizure within the meaning of the Fourth Amendment. And from plaintiff's perspective, that loss in turn can be found to be a loss of pursuing one's chosen profession. There are at least two fundamental reasons why this component of plaintiff's claim cannot proceed.

First, both the United States Supreme Court and the Supreme Court of Pennsylvania have rejected the proposition that an elected official has a property or liberty interest in his or her elected office. See Snowden v. Hughes, 321 U.S. 1, 7 (1944) ("More than forty years ago this Court determined that an unlawful denial by state action of a right to state political office is not a denial of a right of property or of liberty secured by the due process clause."); In re 1991

Pennsylvania Legislative Reapportionment Comm'n, 609 A.2d 132 140-41 (Pa. 1992) ([E]lected officials' interest in their offices does not merit constitutional protection").  It follows *a fortiori* that an elected official lacks a constitutionally protected interest in one of the privileges that inure to holding the elected office.  It further follows that losing a certification to carry a weapon while performing the duties of a constable while not losing the ability to hold the office of constable is not an interest that garners constitutional protection.  Cf. Swinehart v. McAndrews, 99 F. App'x 60, 62-63 (3d Cir. 2003) (given a constable's status as an independent contractor, a constable lacks an enforceable property interest in receiving assignments within his or her judicial district).

Similarly, the courts consistently have rejected the proposition that suffering a mere injury to reputation that creates an obstacle in acquiring work within one's regular vocation rises to the level of an injury that will support a constitutional claim for damages.  Instead, one must demonstrate the inability to work within the entire field of one's occupation before a constitutional injury will be recognized.  See Piecknick v. Pennsylvania, 36 F.3d 1250, 1262 (3d Cir. 1994) ("It is the liberty to pursue a calling or occupation and not the right to a specific job that is protected by the Fourteenth Amendment."); Siegert v. Gilley, 500 U.S. 226, 234 (1991) (impairment of future job prospects is an injury to one's reputation but it does not rise to a the level of constitutional concern); Hunter v. S.E.C., 879 F. Supp. 494, 497 (E.D. Pa. 1995) ("Even the 'serious impairment of future employment prospects' or loss of business opportunities resulting from an injury to reputation does not elevate a tortious injury to constitutional dimensions.") (quoting Siegert, 500 U.S. at 234 and citing Puricelli v. Borough of Morrisville, 820 F. Supp. 908, 915 (E.D. Pa. 1993), aff'd, 26 F.3d 123 (3d Cir.), cert. denied, 513 U.S. 930

48

(1994); <u>Defeo v. Sill</u>, 810 F. Supp. 648, 656 (E.D. Pa. 1993)); <u>Clark v. Township of Falls</u>, 890 F.2d 611, 620 (3d Cir. 1989) ("The possible loss of future employment opportunities is patently insufficient to satisfy the requirement imposed by <u>Paul</u> that a liberty interest requires more than mere injury to reputation.").

Here, while plaintiff can establish that he was precluded from conducting private security at the Slippery Rock School District because of the filed charges, he has not advanced anything beyond broad generalized claims of loss and harm to his reputation to show that the negative repercussions from the charges being filed had a quantifiable impact on his ability to provide private security for other clients and/or members of the community. He likewise cannot show that the "black listing" which he references actually had any financial impact on his earnings as either a constable or a private security guard.

Protection of a liberty interest under the Due Process Clause requires a plaintiff to show he or she has been precluded from pursing an entire calling or occupation. Plaintiff cannot establish that he was precluded from the entire realm of performing either the duties of a constable or those in providing private security. He has failed to advance any sound reason to adopt a different rule under a malicious prosecution claim governed by the Fourth Amendment and we are unaware of one. It follows that the generalized diminution in the ability to serve warrants and/or provide private security as claimed by plaintiff is not a liberty interest that will sustain his federal malicious prosecution claim pursuant to the Fourth Amendment and/or any due process claim plaintiff is attempting to advance pursuant to the Fourteenth Amendment. Consequently, in additional to the existence of probable cause and qualified immunity, defendants are entitled to summary judgment on plaintiff's federal malicious prosecution claim as well as any purported

Fourteenth Amendment due process claim because he has failed to advance evidence to show a sufficient deprivation of a liberty interest.

Plaintiff's state law claim for malicious prosecution against Petrosky fails for the same reasons summary judgment must be granted on his claim for false arrest.  To establish a claim for malicious prosecution under Pennsylvania law, a plaintiff must demonstrate: (1) defendant initiated a criminal proceeding; (2) the proceeding terminated in the plaintiff's favor; (3) defendant initiated the proceeding without probable cause; and (4) defendant acted maliciously or with a purpose apart from bringing plaintiff to justice.  See Hilfirty v. Shipman, 91 F.3d 573, 579 (3d Ci. 1996) (citing Haefner v. Burkey, 626 A.2d 519, 521 (Pa. 1993); see also Donahue v. Gavin, 280 F.3d 371, 379 (3d Cir. 2002).

As with all other claims in the case, the parties vehemently dispute the existence of probable cause to arrest and ultimately charge plaintiff.  "The Pennsylvania and federal standards regarding the existence of probable cause are the same." DeBellis v. Kulp, 166 F. Supp. 2d 255, 280 (E.D. Pa. 2001) (citing Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994). Consequently, the probable cause analysis set forth above on plaintiff's federal claims applies with equal force to plaintiff's state law malicious prosecution claim and for the same reasons underlying that analysis defendants are entitled to summary judgment on this claim as well.[12]

---

[12]  The state law claim of malicious prosecution against Manor Township at count III was dismissed by the Memorandum and Order of March 5, 2020, granting in part defendants' motion to dismiss.

For the reasons set forth above, defendants are entitled to summary judgment on all remaining claims.  Consequently, defendants' motion for summary judgment will be granted and plaintiff's motion will be denied.[13]  Appropriate orders will follow.

Date: March 28, 2023

s/David Stewart Cercone
David Stewart Cercone
Senior United States District Judge

cc:    Lawrence E. Bolind, Jr., Esquire
       Suzanne B. Merrick, Esquire
       Brook T. Dirlam, Esquire

       (Via CM/ECF Electronic Mail)

---

[13]  As the party bearing the burden of proof, plaintiff's burden to establish entitlement to summary judgment on his remaining claims is considerably more demanding that his burden to show that genuine issues of material fact remain for trial in response to defendants' motion for summary judgment.  See National State Bank v. Federal Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992) ("Where the party moving for summary judgment is the plaintiff, or the party who bears the burden of proof at trial, the standard is more stringent.").  It follows that plaintiff's inability to advance sufficient evidence to survive defendants' motion for summary judgment is fatal to his motion for summary judgment.